**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Delmer PORTER, Kenneth A. Berdick,
M.D. and Myron Teitelbaum, M.D.,
Defendants-Appellants.**

No. 78–5020.

United States Court of Appeals,
Fifth Circuit.

March 21, 1979.

Barbara L. Suhar, South Miami, Fla., for Porter.

Eugene Heiman, Miami, Fla., for Berdick.

Albert J. Krieger, Miami, Fla., for Teitelbaum.

Jack V. Eskenazi, U. S. Atty., Miami, Fla., James Roland DiFonzo, Atty., Appellate Section, Sidney M. Glazer, Nash W. Schott, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge.

This criminal prosecution springs from attempts by the government to police a vast, ever-expanding Medicare program. Since the occurrence of the activities treat-

ed in this appeal, Congress has amended one statute to more specifically describe what conduct is proscribed. Moreover, the Department of Health, Education and Welfare no longer pays for the services which prompted the indictment of these defendants. After a thorough examination of the record we have been driven to the conclusion that the indictment, in its various counts, failed to charge a crime and that the government failed at trial to prove the commission of any crime denounced by federal statutes.

Accordingly, we reverse the convictions on all counts and remand the case with instructions that the indictment be dismissed.

## THE FACTS

This case involves the challenged activities of eight doctors and one laboratory operator in the Miami, Florida, area, a place which has traditionally been a haven for retired persons, many of whom are dependent on the Medicare program in connection with health care. Six of the indicted doctors [1] pled guilty to receiving kickbacks and bribes in connection with furnishing medical services to Medicare patients, in violation of 42 U.S.C. § 1395nn(b)(1). They were sentenced to a term of probation and fined. The other three defendants, laboratory operator Delmar Porter, Dr. Kenneth A. Berdick, and Dr. Myron Teitelbaum, appellants here, stood trial to a jury and, after a heatedly combative four weeks in the courtroom, were convicted of various counts charging conspiracy to defraud the United States, mail fraud, and either offering or receiving kickbacks or bribes in connection with supplying Medicare services.

The Department of Health, Education and Welfare, as the agency responsible for administering the Medicare program, contracts with various private insurance carriers to perform certain services. In 1973 HEW used Blue Shield to determine reasonable charges for medical services in Florida, to determine eligibility for reimbursement under Medicare, and to pay the Medicare claims originating in that state. These claims were generally submitted on a "Request for Medicare Payment" form (Form 1490), which required a detailed description of the services rendered by the physician to the Medicare beneficiary (patient).

In the exercise of professional judgment, physicians may determine that tests for the presence of various diseases should be performed on blood samples taken from the patient. Typically, the doctor, or a member of his staff, draws the blood from the patient, separates the blood cells from the serum, labels and identifies the specimen, and sends it to an independent laboratory for analysis. The doctor then arrives at a diagnosis from the test results. These laboratories, not a part of the doctor's office, have arisen in response to a demand for such services, and they are most common in urban areas. The testimony at trial indicated that there are basically two types of laboratories which perform these blood tests—the manual and the automated. The former is a laboratory which has a number of different machines, each of which is designed to perform only one test at a time. The latter has one expensive machine capable of simultaneously performing an entire battery of tests. In general, automated laboratories perform the tests faster and at a lower unit cost than manual laboratories, but there seems to be a difference of opinion concerning the quality of the results, with perhaps a concensus leaning toward the automated labs. It would appear from the record that doctors were under no rule, regulation, or other compulsion to choose one type of laboratory in preference to another and were free to exercise their professional judgment in making a choice. In many areas there is only one laboratory reasonably available, so doctors in such areas have no option but to send their blood samples to that laboratory. In other areas, such as Miami, several laboratories offer

---

1. Those six were Richard L. Lipman, Monroe J. Scheiner, Hugh J. Connolly, Michael A. Cogan, Leonard L. Weil, and Stuart Leeds.

these services and compete for the business of the local physicians.

Assuming that the services performed are substantially equal in quality, it would ordinarily be assumed that these labs would compete on the basis of price and that the lower-priced services of the automated labs would soon drive the manual labs out of business. This, however, was not the case in the Miami area. Blue Shield regularly reimbursed on Medicare claim forms filed by both manual and automated laboratories and paid the higher rates for services performed by manual labs. Testimony at trial indicated that during 1973–74, an automated lab which performed a battery of blood tests called an "SMA-20" would receive a Medicare reimbursement of $35, whereas a manual lab would receive $214 for the same service. Because it takes a certain amount of time for a doctor to draw a blood sample, label it, and analyze the tests results, Medicare permitted physicians to bill directly for their services related to these blood tests. The amount which Medicare paid for such services was apparently somewhat low and during the indictment period was always less than $6. Rather than bill Medicare directly and accept these sums, each of the eight doctor defendants in this case sent blood samples to the manual lab operated by Porter, who paid the doctors up to $35 for each blood sample sent to the lab. The doctors claim that these payments represent legitimate "handling fees", but the government chooses to refer to them, variously, as bribes, kickbacks, or rebates, and contends that the offer and acceptance of such payments were criminal acts. The correctness of this contention is, of course, the crucial issue in this case.

Porter was the key figure in these operations. He had been employed in the lab business for 16 years, first by Universal Medical Laboratories and then by Damon Laboratories. In 1973 Porter left Damon and established Southeastern Medical Laboratories (SML), a manual lab, with the financial assistance of Dr. David Thornburgh, who had also been employed by Damon but who was not indicted by the grand jury. Sometime later, Porter established a second manual lab in Miami, "Laboratories of Florida" (LOF), in which Dr. Teitelbaum held 60% of the stock in trust for his children. Porter and Thornburgh were familiar with a procedure pioneered by Damon called the AdServ concept, under which doctors would be paid a handling fee by a third party, AdServ, for submitting blood specimens from Medicare beneficiaries and would accept lab work for non-Medicare patients at a reduced price or at cost. Under this arrangement, therefore, the doctors profited and non-Medicare patients were subsidized by the Medicare program. The AdServ concept apparently enjoyed enormous popularity and was employed by physicians throughout the country.

Because the originators of the AdServ concept thought it essential that physicians be paid by a third party and not by the lab, it was necessary to set up a dummy corporation. Defendants Scheiner, Lipman, and Connolly owned 60% of the SML stock, and Lipman arranged to have his brother, an attorney, set up a corporation known as Medical Administrative Services (MAS of Mississippi). That corporation operated until the spring of 1974, when its functions were taken over by a Florida corporation, also named Medical Administrative Services (MAS of Florida). The record reveals that the only function of these two corporations was to act as a conduit to handle the money from the labs to the doctors. The labs sent money to the dummy corporations, which then issued checks to the doctors who had submitted the blood specimens of Medicare patients to the labs. Each of the defendant doctors utilized one or both of these two labs.

For example, Dr. Teitelbaum switched in 1973 from National Health Laboratories (National), an automated lab, to SML and LOF. Trial testimony indicated that National, which did not offer a handling fee to doctors, charged $7 for an SMA-12 battery of blood tests. LOF charged $100 for the same series of analyses. Teitelbaum sometimes received his laboratory "handling fees" directly from Porter, and on occasion these fees were in addition to what he

received as a result of directly billings his patients.

During the period 1973–75, SML and LOF received over $400,000 in Medicare payments. The labs, either directly or through the dummy corporations, paid over $73,000 in fees to the eight defendant doctors. Berdick received over $11,000; Teitelbaum, over $24,000.

In early 1974, after defendant Lipman, whose office in Miami issued the MAS of Mississippi checks, told Porter that he had been advised by an attorney that MAS of Mississippi was "unethical and possibly illegal", and that he did not want to participate any longer, MAS of Florida began to pay the doctors who submitted Medicare patients' blood specimens to SML and LOF. This arrangement continued until October 1974, when the labs switched to paying handling fees for Medicare patients by a credits system. At that time, bills for private, non-Medicare patients' analyses were reduced by an amount which corresponded to the amount of the "handling fee" paid by the laboratory on Medicare patients.

In addition to the payment of these sums of money to the doctors, who were evidently induced thereby to utilize the manual laboratories with their higher reimbursement rate from Blue Shield, defendant Porter directed that Medicare patients who did not have complementary insurance to pay for the 20% co-insurance would not be billed for the co-insurance. Either Porter or Lipman directed that any patient who complained about the co-insurance amount should be told he did not have to pay it. Berdick, on the other hand, directed his medical receptionist to tell patients who complained about laboratory charges for the blood specimens that he was "running extensive cancer tests" on them. In fact, no cancer tests were being administered.

In July 1975, the Medicare carrier notified doctors in Florida that it would no longer pay for lab analysis on a manual basis, but that it would pay for such services only at the automated rate. Upon receipt of this information, manual labs generally ceased paying handling fees.

*The Medicare Kickback or Bribe Counts*

Appellants Porter, Berdick, and Teitelbaum were convicted on 19, 7, and 14 counts, respectively, of violating 42 U.S.C. § 1395nn(b)(1).[2] Section 1395nn(b), at the time of the alleged offenses, provided that:

(b) Whoever furnishes items or services to an individual for which payment is or may be made under this subchapter and who solicits, offers, or receives any—

(1) kickback or bribe in connection with the furnishing of such items or services or the making or receipt of such payment, or

(2) rebate of any fee or charge for referring any such individual to another person for the furnishing of such items or services,

shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

The indictment charged Drs. Berdick and Teitelbaum with receiving bribes *and* kickbacks and Porter with offering bribes *and* kickbacks in violation of this statute.

On the eve of trial, the prosecutor announced that he was proceeding under the theory that bribes, *and not kickbacks,* were involved. Although the case apparently was tried on the basis of "bribery", the judge nevertheless instructed the jury as to the meaning of both the words "bribe" and "kickback".

The jury returned a verdict of guilty as charged on all counts. Literally, that could mean that the various defendants offered or received both kickbacks and bribes. The indictment charged in the conjunctive although the statute uses the disjunctive "or", thus indicating that "bribes" and "kickbacks" do not have the same meaning.

**2.** This section was added by the Social Security Amendments of 1972, Pub.L.No.92–603, § 242(b), 86 Stat. 1329 (1972). It was amended in 1977 by the Medicare-Medicaid Antifraud and Abuse Amendments, Pub.L.No.95–142, § 4(a), 91 Stat. 1175 (1977). *See* note 3 *infra.*

In any event, in the posture in which the case comes to us, we shall decide this appeal as if the payments made in this case could have been considered either as bribes or as kickbacks within the meaning of 42 U.S.C. § 1395nn(b)(1).

■ ˙ This appeal presents us with a case of first impression, so there is no accumulation of jurisprudence on the actual meaning of the words "kickback" and "bribe" as used in this statute. The statute does not define the terms. That being so, we must assume that Congress used these words as they are commonly and ordinarily understood. *See United States v. Stewart*, 311 U.S. 60, 63, 61 S.Ct. 102, 85 L.Ed. 40 (1940). We therefore look to similar statutes, the common law, and common sense to aid in the interpretation of these words, mindful of Mr. Justice Jackson's admonition in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952):

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

342 U.S. at 263, 72 S.Ct. at 250.

■ Since this is the first prosecution under this statute, we must construe the statute strictly against the prosecution and in favor of the accused. *Smith v. United States*, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959). If there is a fair doubt as to

whether a defendant's conduct is embraced in the prohibition, the policy of lenity requires that the doubt be resolved in favor of the accused. *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958).

Although § 1395nn(b) has not been construed by any other Court of Appeals, the Second Circuit has construed another statute, 42 U.S.C. § 1396h(b),[3] which is almost identical in wording to that of the statute we consider today. In *United States v. Zacher*, 2 Cir. 1978, 586 F.2d 912, that Court reversed a defendant's conviction on four counts of receiving bribes in connection with providing Medicaid services. Zacher operated a nursing home and charged private patients $29 per day. Some of the patients were eligible for Medicaid, which would reimburse nursing home operators at the rate of $25 per day. Zacher admitted four Medicaid patients on the understanding that their families would pay an additional $4 per day as a supplement to the Medicaid payments. The government contended that those supplementary payments were bribes and secured convictions under 42 U.S.C. § 1396h(b). The Second Circuit surveyed the jurisprudence on bribery and concluded that "courts have consistently understood the word 'bribe' to encompass acts that are *malum in se* because they entail either a breach of trust or duty or the corrupt selling of what our society deems not to be legitimately for sale . . . .. It is this element of corruption that distinguishes a bribe from a legitimate payment for services." 586 F.2d at 916. In other words, the Second Circuit concluded that the receipt of supplemental payments when a patient was eligible for Medicare rather than private insurance would not, without more, constitute the taking of a bribe.

**3.** Prior to amendment in 1977, 42 U.S.C. § 1396h(b) read as follows:

Whoever furnishes items or services to an individual for which payment is or may be made in whole or in part out of Federal funds under a State plan approved under this subchapter and who solicits, offers, or receives any—

(1) kickback or bribe in connection with the furnishing of such items or services or the making or receipt of such payment, or

(2) rebate of any fee or charge for referring any such individual to another person for the furnishing of such items or services shall be guilty of a misdemeanor and upon conviction thereof shall be fined no more than $10,000 or imprisoned for not more than one year, or both.

Turning to the case before us, there was no duty to choose an automated lab in preference to a manual lab; there was no falsification of government reports or records; and the fees charged by the labs were approved and paid by the designated agent of HEW. In sum, the receipt of the money by the labs in no way violated the law. What the government complains of is that once the labs lawfully received a lawful fee they shared it with a doctor who had referred the specimen to the lab. Yet, there was no outstanding restriction on what the lab could do with the money once it received it.

■■■ Consequently, as of the date of the occurrence in question we perceive no basis in law for denominating these payments as bribes, even though the government informed both the Court and the defendants that it was pursuing the prosecution on the basis of bribery.

Similarly, the acts alleged in the indictment did not constitute "kickbacks" within the meaning of 42 U.S.C. § 1395nn(b). In ordinary parlance, a kickback is the secret return to *an earlier possessor* of part of a sum received. As the Second Circuit in *Zacher, supra*, interpreted the term in a similar statute, a kickback "involve[s] a corrupt payment or receipt of payment in violation of the duty imposed by Congress on providers of services to use federal funds only for intended purposes and only in the approved manner." 586 F.2d at 916. Other federal statutes which prohibit the offer, acceptance, or solicitation of kickbacks are aimed at preventing the corruption of the judgment of a public official [4] or of some individual who has a specific duty imposed upon him by the Congress.[5] We cannot locate any duty imposed upon any of these defendants by a statute or regulation, the violation of which would amount to a misapplication of federal funds. Therefore, we can only conclude that no crime involving kickbacks has been charged or proven.

■■■ Our conclusion that 42 U.S.C. § 1395nn(b) did not make criminal the acts charged in the indictment is strengthened, if not absolutely compelled, by events subsequent to the indictment period. In 1977, Congress amended § 1395nn(b) and increased the penalties for violation of that statute to a fine of up to $25,000 or imprisonment for up to five years or both. At the same time, Congress completely changed the wording of the statute and made the description of the crime much more specific. The legislative history clearly indicates that the reason for this substantial alteration of the wording was the fact that Congress and many United States Attorneys believed "that the existing language of these penalty statutes [42 U.S.C. §§ 1395nn and 1396h] is *unclear and needs clarification.*" H.R. Rep.No.95–393(II), 95th Cong., 1st Sess. 53 (1977), *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 3039, 3055 (emphasis added).

If the meaning of the 1972 version of 42 U.S.C. § 1395nn(b) was not clear and precise to the Congress and to United States Attorneys charged with enforcing the law, then we are hard put to say, with that degree of confidence required in a criminal conviction, that these defendants were given clear warning by that statute that their conduct was prohibited by it, thus amounting to a criminal act.

---

**4.** 41 U.S.C. § 51 is a statute designed to guard against the improper awarding of subcontracts and the corruption of the judgment of public officials. *See Howard v. United States*, 1 Cir. 1965, 345 F.2d 126. Several sections of the Internal Revenue Code refer to kickbacks paid to an official, employee or agent in fact of a government. *E. g.*, I.R.C. §§ 952(a)(4), 995(b)(*1*)(F)(iii). *See also* I.R.C. § 964(a).

**5.** 18 U.S.C. § 1954 prohibits the offer, acceptance, or solicitation of kickbacks to influence the operations of an employee benefit plan. 18 U.S.C. § 874 proscribes kickbacks from public works employees. *See Slater v. United States*, 1 Cir. 1976, 562 F.2d 58 (defendant who accepted kickbacks from an independent contractor could not be convicted of violating § 874). I.R.C. § 162(c) disallows deductions for illegal bribes or kickbacks, and paragraph 3 of that subsection prohibits deductions for kickbacks, rebates, or bribes made in connection with the furnishing of services under Medicare or Medicaid. This latter provision is apparently a companion statute to the statute at issue in the case before us, but it does not, in our opinion, add any weight to the government's position.

## The Conspiracy Count

Count 1 of the indictment charged that the defendants had violated 18 U.S.C. § 371, which, in pertinent part, broadly prohibits conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose . . . ." Specifically, Count 1 charged that the defendants "did with each other and with diverse other persons both known and unknown to this Grand Jury, wilfully, knowingly and unlawfully combine, conspire, confederate, and agree together to defraud the United States of America and its agency, the Department of Health, Education, and Welfare, of its right to have the Medicare program conducted honestly, fairly and free from deceit, craft, trickery, corruption, dishonesty, fraud and kickbacks." The defendants argue that Count 1 failed to charge the commission of any crime and that their conspiracy convictions should therefore be reversed. We agree.

Despite the fact that it paid no sums of money in excess of the amounts authorized for blood tests in the Miami area, that it suffered no loss of its property or money, that no materially false statements were filed, that no public officials were bribed or participated in the scheme, and that no statute or regulation required the doctors to send the blood samples of Medicare patients to automated labs, the government insists that it has been defrauded by this alleged conspiracy. Although it has been noticeably ambivalent on this point, we believe that it is the government's position that the criminal "fraud" involved in this case is the receipt of part of the Medicare reimbursement by the doctors through the dummy corporations. If those corporations had not existed, and if the labs had not paid money directly to the doctors, we are uncertain as to whether the government would characterize the payment of dividends to the labs' doctor-stockholders as a "fraud". Our impression is that the government would so characterize such payments, since it is most insistent that these doctors have been unjustly enriched through some sort of "excess profits".

The real question, however, is whether the defendants' conduct "plainly and unmistakably" falls within the proscription of 18 U.S.C. § 371. *See United States v. Gradwell*, 243 U.S. 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917). This statute has been construed on a number of occasions by the Supreme Court. In *Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), the Court provided the following interpretation of § 371:

> To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

265 U.S. at 188, 44 S.Ct. at 512.

More recently, the Court has endorsed the proposition that the statutory language reaches "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966). *See also United States v. Johnson*, 383 U.S. 169, 172, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); *Haas v. Henkel*, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569 (1910). In *Dennis*, a scheme to secure the benefit of the services of the NLRB by filing false non-Communist affidavits was held to be a conspiracy to defraud the United States.

Since it is conceded that the government has not been subjected to any property or pecuniary loss by the activities set forth in the indictment,[6] the conspiracy count can stand only if the government can point to

---

**6.** The indictment did not charge that the government suffered any property or pecuniary loss, the case was not tried on that theory, and there were no jury instructions on such a theo-

some lawful function which has been impaired, obstructed or defeated. The government simply asserts that it was defrauded of its right to have the Medicare program conducted honestly and fairly. In our opinion, in the context of a criminal prosecution, the government has failed to demonstrate interference with any of its lawful functions. The doctors were under no duty at the time of the events in question to send their patients' blood samples to automated labs, if available. Perhaps because of the excessive payments for identical services which Medicare was previously forced to pay as a result of its own rules and practices, the government has changed its policy and the Medicare program no longer pays for blood tests conducted by manual labs when automated labs are available for use. This change in policy must weigh heavily against the government's assertion that it was defrauded.

ry. In its initial brief, the government did not argue that it had suffered any property or pecuniary loss, but after oral argument it occurred to us that one theory may have been overlooked. Accordingly, we directed all counsel to submit simultaneous briefs addressed to the following issue:

> Paragraph 40 of Count 1 of the indictment charges that the defendants agreed that the Medicare patients would not be billed for the coinsurance sums specified in paragraph 5. If the Medicare patients were not so billed, was the effect of that omission the payment by the government of 80% of the "reasonable cost" of, for example, a $125 lab analysis, or the payment by the government of 100% of a $100 lab analysis? If the latter, does this constitute defrauding the government in the pecuniary sense? With respect to paragraph 40, what was proved at trial? What were the jury instructions, if any, relative to this point?

Perhaps predictably, the government now argues that the conspiracy included an agreement not to collect the coinsurance sums from patients and that this agreement resulted in pecuniary loss to the government. As the government puts its case in its supplemental brief:

> Blue Shield, the Medicare carrier, was authorized to reimburse the provider of health services for 80% of the "reasonable charges" for services to Medicare patients. 42 U.S.C. 1395 *l*(a). The "reasonable charge" for a service was not to exceed the health provider's "customary charge". 42 C.F.R. 404.507, 405.502(a). By regularly failing to bill or collect the co-insurance sum, equal to 20% of the bill submitted to the Medicare carrier, the "customary charges" which the laboratories billed for their health services were in effect decreased by 20%, and the government reimbursement should have been 80% of that reduced amount, rather than 80% of the original (and thus inaccurate) bill submitted to Medicare.

We have no choice but to hold that the government's belated embrace of this "pecuniary fraud" theory must fail. In the first place, it was the government itself, acting through its agent, the Medicare carrier, which established the individual physician profiles and determined the "reasonable charges" for various services. Even if we could conclude that the failure to collect the 20% coinsurance amounts effectively lowered the defendants' "customary charges", we would be unable to conclude that such conduct constituted defrauding the government in the pecuniary sense. 20 C.F.R. § 405.455(b) provides that the government would reduce the "customary charges" authorized in the event that a physician "does not actually impose such [customary] charges in the case of most patients liable for payment for its services on a charge basis or fails to make reasonable efforts to collect such charges from patients liable for payment for its services on a charge basis . . . ." The government simply cannot take the position that it can tell physicians that the failure to collect these coinsurance sums will result in a simple reduction of the physicians' "customary charges", on the one hand, and a simultaneous criminal prosecution for conspiracy to defraud, on the other.

In the second place, even if this "pecuniary fraud" theory were viable, the proof adduced at the trial below failed to prove the existence of any conspiratorial agreement not to bill the Medicare patients and thereby to defraud the government. The evidence clearly showed that both Berdick and Teitelbaum billed their patients for the coinsurance sums, and they even received complaints from some of their patients about those bills. There was no evidence that either Berdick or Teitelbaum knew any of the other defendants, except Porter. Although it is the general rule that the acts of one co-conspirator may be attributed to all the other co-conspirators, the acts of Lipman, Connolly, and Porter in not billing some patients cannot be attributed to Berdick and Teitelbaum because an agreement not to bill patients would have been the essence of the conspiracy. At best, the proof could only have demonstrated the existence of "wheel" conspiracies, none of which involved Berdick and Teitelbaum.

Finally, the jury was given no instructions on this theory, and we cannot at this late date reconstruct the government's case to affirm three convictions on a theory which was never adopted at trial.

Furthermore, no statute or regulation placed these doctors on notice that they could receive payment for their work in drawing and handling blood samples *only* by directly billing the patient, billing the Medicare carrier or billing a third party insuror. Paragraph 10 of Count 1 asserted that "[p]hysicians were prohibited from receiving said drawing or handling fee from the provider of the service of laboratory analysis and his agent." Defendants' counsel repeatedly sought production of the statutes or regulations which provided the basis for that assertion, but the government refused on the grounds that the statutes or regulations were equally available to all parties. Following oral argument, we requested the government to direct the Court's attention to all statutes, rules or regulations which formed the basis for the statements in paragraph 10.

■ The response failed to identify any statute or regulation which prohibited physicians from receiving handling fees from the labs. Instead, the government asserted that "[d]uring the time period covered by the indictment, the Medicare carrier provided that charges for the drawing or handling of blood should be submitted by a physician to the carrier as a separate service charge (Gov't Ex. 155, 157, see Tr. 59, 62, 1897)." The two exhibits cited by the government are a March, 1974 Blue Shield publication entitled "Medicare Notes", which outlined the procedure to be followed when doctors bill Medicare for lab tests, and an August 27, 1970 letter from Blue Shield on the same subject. Neither letter prohibited doctors from receiving payments from labs, and, even if there had been some proof at trial that these defendants had received and read these documents, and there was no such proof, we do not think that mere letters from Blue Shield could form the basis for a criminal prosecution. In short, no statute or regulation formed the basis for the allegation in paragraph 10 of the indictment.

■ We must hold that the indictment failed to charge a conspiracy to defraud the United States and that the government failed to prove any such conspiracy at trial.[7] It is our affirmative duty to carefully scrutinize indictments under the broad language of the conspiracy statute because of the possibility, inherent in a criminal conspiracy charge, that its wide net may ensnare the innocent as well as the guilty, *see Dennis v. United States*, 384 U.S. 855, 860, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); *Krulewitch v. United States*, 336 U.S. 440, 445–458, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring). We cannot hold that the defendants' conduct was "plainly and unmistakably" proscribed by 18 U.S.C. § 371.[8] *See generally* Goldstein, Conspiracy

---

**7.** The case of *United States v. Beasley*, 5 Cir. 1977, 550 F.2d 261, does not compel a contrary result. Although the opinion in that case states that the indictment charged the defendants "with conspiracy to defraud the United States . . . of its right to have its program under Title IV–A of the Social Security Act administered fairly, honestly and free from corruption, deceit, trickery, and dishonesty," 550 F.2d at 263, wording which is similar to the conspiracy charge in this case, it is evident that the conspiracy charge in *Beasley* included allegations that the defendants had submitted false claims for money against the United States and had fraudulently concealed material facts within the jurisdiction of a federal agency. 550 F.2d at 264, 270. The charges were proved at trial, and their convictions were properly affirmed. The element of pecuniary loss, present in *Beasley*, is not so present in the case at bar.

Similarly, our more recent case of *United States v. Winkle*, 5 Cir. 1979, 587 F.2d 705, also involved the elements of pecuniary loss and the submission of false claims.

**8.** In view of our conclusion that Count 1 did not charge the defendants with the commission of any crime, we need not reach any of defendants' other conspiracy-related arguments. We note, however, that there are substantial questions as to whether the government proved the existence of multiple conspiracies rather than the single grand conspiracy charged in the indictment, *see e. g., Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Levine*, 5 Cir. 1977, 546 F.2d 658; *United States v. Perez*, 5 Cir. 1973, 489 F.2d 51; and, if indeed one conspiracy was proved, whether the evidence was sufficient to establish that each defendant knew of the existence of the conspiracy and, acting with that knowledge, joined the conspiracy, *see, e. g., United States v. Malatesta*, 5 Cir. 1978, 583 F.2d 748, *rehearing en banc granted.*

to Defraud the United States, 68 Yale L.J. 405 (1959).

### The Mail Fraud Counts

 It necessarily follows that Counts 2 through 67 of the indictment failed to charge the defendants with mail fraud in violation of 18 U.S.C. § 1341. That statute prohibits the use of the mails for the purpose of executing any scheme or artifice to defraud,[9] and the indictment charged that the defendants "did knowingly, wilfully and unlawfully devise and intend to devise a scheme and artifice to defraud the United States . . . of its right to have its Medicare programs for providing health insurance to the aged . . . conducted honestly, fairly, impartially, and free from deceit, craft, trickery, corruption, dishonesty, fraud and kickbacks . . . ." No other scheme to defraud was charged and proved, and there are no persuasive reasons for analyzing a crime of defrauding the United States in a different manner under § 1341 than we have previously done under § 371. Therefore, the mail fraud convictions of the appellants are reversed.

### CONCLUSION

It is not our function to evaluate the medical ethics of the doctors involved in this matter. It is not for us to hurl criticism at HEW for failure to promulgate rules and regulations which would have forestalled the occurrences which the government felt, after the fact, it should characterize as criminal offenses. We sit only as Judges of the law.

Under the law, these convictions must be reversed, and the case remanded to the District Court to dismiss the indictment.

REVERSED and REMANDED with Directions.

---

**9.** 18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.