POLK COUNTY, Texas d/b/a Polk
County Memorial Hospital

v.

Kenneth W. PETERS, M.D.

Civ. A. No. 9:92CV45.

United States District Court,
E.D. Texas,
Lufkin Division.

Aug. 28, 1992.

John S. Holleman, Livingston, Tex., for
plaintiff.

James W. Rice, James W. Rice & Associates, Houston, Tex., for defendant.

## MEMORANDUM OPINION

GUTHRIE, United States Magistrate
Judge.

This action was tried before the Court on
July 9, 1992. Plaintiff Polk County, Texas,
seeks a judgment for money advanced to
Defendant Kenneth Peters, M.D., pursuant
to a Physician Recruitment Agreement.
Plaintiff also seeks to recover attorney
fees.

Defendant has advanced numerous defenses, including the illegality and voidness
of the Physician Recruitment Agreement
(the Agreement) itself. After careful consideration, the Court has determined that
the Agreement is indeed illegal under the
Social Security Act, 42 U.S.C. § 1395nn
(1983) and therefore unenforcible under the
applicable Texas law. In that this determination of illegality is dispositive, the Court
has addressed neither the additional defenses nor the question of attorney fees.

## I. THE PHYSICIAN RECRUITMENT AGREEMENT

Section 1 of the Agreement (P.Ex. 1)
states in its entirety:

Physician shall, on or before August 5,
1985, commence the private practice of
medicine in Livingston as a General Surgeon and shall utilize Hospital for his
patients who require hospitalization, unless, in Physician's professional judgement, the use of another medical facility
is necessary or desirable in order to provide proper and appropriate treatment
and care to such patient (or to comply
with the desires of a patient or the patients's family.)

Section 2 provides that the hospital's obligation to advance money under Section 3 is
specifically conditioned upon eight conditions, three of which are:

(d) Physician shall engage in the private
practice of medicine as a General Surgeon in Livingston on a full-time basis
for at least twelve (12) months after August 5, 1985.

(e) Physician shall comply with the provisions of Section 1 of this Agreement;

(f) Physician shall use and exercise his
best and most diligent efforts during normal professional hours to develop his
practice in Livingston:

Section 3 provides that subject to the
conditions of Section 2, the Hospital guarantees that the Physician shall have gross
cash receipts of $8,500.00 per month for
twelve months beginning the first day Phy-

sician commences private practice in Livingston. At the end of the twelve months, Physician shall repay amounts advanced either in three equal monthly installments beginning August 5, 1986 or by assignment of the Physician's accounts receivable.

In Section 4, the Hospital agrees to provide Physician with an office in the hospital for three months at no rental cost, rental and utilities of up to $6,000.00 on the Physician's office for six months commencing with occupancy, and reimbursement of up to $5,000.00 for expense of moving Physician's residence to Polk County. In Section 2(b) the Hospital also agrees to reimburse Physician up to $7,500.00 for his first year's malpractice insurance premiums.

## II. THE TRIAL

### A. Stipulations

The parties stipulated that the Agreement was executed by Defendant and hospital administrator Tom Gilbert, that the sum of $30,684.44 had been advanced to Defendant, that Defendant had repaid none of the sum, and that Defendant had received a letter, P.'s Ex. 2, from Tom Gilbert on or about March 6, 1987.

### B. Relevant Testimony

Plaintiff's only fact witness, attorney Terrell Pace, was president of the Livingston Hospital District Board when the Agreement was executed. He was aware of some efforts to collect on similar contracts with Doctors O'Donnel, Carter, and Shiner and was unaware of whether any efforts had been made to collect on contracts with Doctors Ingram, Shukan or any of several other physicians with similar contracts.

Defendant testified that despite his requests, he was never provided with an office in the hospital and that he was without an office in which to practice medicine until a new building was completed in mid-November, 1985. Failure to provide an office in the hospital severely hampered the establishment of his surgical practice and most of the advances pursuant to the Agreement were attributable to shortfalls during the first three months.

When he received Tom Gilbert's March 6, 1987 letter, which requested that he begin to make arrangements for a payment schedule on the $30,684.44 advanced, Defendant met with him. At that time all other physicians on the hospital staff except one were boycotting the hospital, but Defendant was supporting the hospital. He produced much more money for the hospital than had been advanced and was using it as his primary hospital. He was assured by Tom Gilbert that collection would not be pursued and "never heard another word" until July, 1990, when he heard of this lawsuit on a television broadcast.

Defendants' wife, a former employee of the hospital, also testified that she understood from her discussions with Tom Gilbert that the March 6 letter had to be done as a formality but that the debt would be taken care of by Tom Gilbert. She did, however, type an affidavit, in conjunction with Defendant's then-pending divorce action, in which Tom Gilbert swore on June 1, 1987, that Defendant owed $30,684.44 on the Agreement. P.'s Ex. 3.

## III. THE STATUTE

The provisions of the Social Security Act prohibiting and punishing Medicare–Medicaid fraud have been the subject of three significant amendments since their inception in the Social Security Amendments of 1972. Pub.L. No. 92–603 § 242(b), 86 Stat. 1329 (1972).

At the time this agreement was executed and performed, the Social Security Act, as amended by Pub.L. No. 95–142, 91 Stat. 1183 (1977), the 1977 Medicare–Medicaid Antifraud and Abuse Amendments, and Pub.L. No. 96–499, 1980, prohibited certain practices by any person or entity receiving Medicare or Medicaid funds. The applicable provision is set out at 42 U.S.C.A. § 1395nn(b) (1983).

### (b) Illegal remunerations

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) (di-

rectly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under this subchapter, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under this subchapter,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under this subchapter, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under this subchapter,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(3) Paragraphs (1) and (2) shall not apply to—

(A) a discount or other reduction in price obtained by a provider of services or other entity under this subchapter if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under this subchapter; and

(B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services.

Prior to 1977, furnishing items or services and soliciting, offering or receiving any kickback, bribe, or rebate in connection therewith constituted a misdemeanor. The 1977 amendment added the language prohibiting "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind". In 1980 the intent requirement was added. Pub.L. 96–499(b).

In 1987, Congress repealed 42 U.S.C. § 1395nn and reenacted the provision in slightly altered form at 42 U.S.C. § 1320a–7b. The words "this subchapter" were modified to state "under subchapter XVIII of this chapter or a state health care program." The current version of 42 U.S.C. § 1395nn (see U.S.C.A. Supp.1991) prohibits a physician from making a referral to an entity for the furnishing of clinical laboratory services if the physician has a financial relationship with the entity. The conditions under which physician recruitment is not a prohibited compensation arrangement is specifically addressed in 42 U.S.C. § 1395nn(e)(4):

In the case of remuneration which is provided by a hospital to a physician to induce the physician to relocate to the geographic area served by the hospital in order to be a member of the medical staff of the hospital, if—

(a) the physician is not required to refer patients to the hospital,

(b) the amount of the remuneration under the arrangement is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician, and

(c) the arrangement meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

In noting the statutory evolution, the Court is aware of the oft-repeated warning that "the views of a subsequent congress form a hazardous basis for inferring the intent of an earlier one." *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct.

2051, 2061, 64 L.Ed.2d 766 (1980). However, "[t]he fact that Congress, in reenacting the substantive sections of the Medicare Fraud statute did not change them, implies that Congress approved prior interpretations such as *Greber*, 760 F.2d 68." *U.S. v. Bay State Ambulance*, 874 F.2d at 31.

## IV. THE CASE LAW

In *United States v. Porter*, 591 F.2d 1048 (5th Cir.1979), a case of first impression, the Fifth Circuit Court of Appeals reversed a conviction for violation of the 1972 version of § 1395nn(b)(1). The Fifth Circuit's conclusion that the original version of § 1395nn(b) did not prohibit the alleged acts of the defendant was "strengthened, if not absolutely compelled" by subsequent events, which led to the enactment of the version of § 1395nn(b) that was in effect in 1985.

> In 1977, Congress amended § 1395nn(b) and increased the penalties for violation of that statute to a fine of up to $25,000 or imprisonment for up to five years or both. At the same time, Congress completely changed the wording of the statute and made the description of the crime much more specific. The legislative history clearly indicated that the reason for this substantial alteration of the wording was the fact that Congress and many United States Attorneys believed "that the existing language of these penalty statutes [42 U.S.C. §§ 1395nn and 1396] is *unclear and needs clarification*." H.R.Rep. No. 95—393(II), 95th Cong., 1st Sess. 53 (1977), *reprinted* in [19797] U.S.Code Cong. & Admin.News, pp. 3039, 3055 (emphasis added). *Id.* at 1054.

The Seventh Circuit took a broader view of the original statute and reached a different result in *United States v. Hancock*, 604 F.2d 999 (7th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 521, 62 L.Ed.2d 420 (1979). Chiropractors who had received fees from labs that performed blood tests argued that amounts paid were legitimate handling fees for obtaining and delivering specimens and then interpreting the test result, but, although the phrase "any remuneration" had not yet been added to the statute, the fees were found to be "kickbacks."

There are three published decisions, all criminal prosecutions, involving the version of § 1395nn(b) that was in effect in 1985. The leading case is *United States v. Greber*, 760 F.2d 68 (3rd Cir.), *cert. denied*, 474 U.S. 988, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985). The defendant physician operated a diagnostic monitoring service for cardiac patients. He billed Medicare for the service and, when payment was received, forwarded 40 per cent of the Medicare fee to the referring physician. Although Defendant claimed that the payments were "interpretation" fees, he actually did the interpretation and the 40 per cent paid was more than Medicare allowed for interpretation. There was also testimony that Defendant had stated that "... if the doctor didn't get his consulting fee, he wouldn't be using our service."

Affirming the conviction, the Third Circuit held that "if one purpose of the payment was to induce future referrals, the Medicare statute has been violated." *Id.* at 69. Even if the referring physician does perform a service for the money received, the statute is aimed at the inducement factor. The court agreed with the Government's argument that Congress intended to combat financial incentives to physicians for ordering particular services patients did not require because such incentives present the potential for unnecessary drain on the system. "If the payments were intended to induce the physician to use Cardio–Med's services, the statute was violated, even if the payments were also intended to compensate for professional services." *Id.* at 72.

*Greber* was followed in *United States v. Kats*, 871 F.2d 105 (9th Cir.1989), which upheld a conviction in which the jury instruction had allowed the jury to convict even if it found that the referral of services was not a material purpose for making kickback payments. The court held that conviction under the statute was proper unless payments are "wholly and not incidentally attributable to delivery of goods and services."

The only other case located involving the pertinent version of § 1395nn is *United States v. Bay State Ambulance*, 874 F.2d 20 (1st Cir.1989). *Citing Greber,* the court upheld the convictions of the owner of an ambulance service and a hospital executive who had been instrumental in the award of an ambulance service contract to the company, which he served as a consultant. Defendants contended that cash and a car received by the executive were in fact reasonable amounts for actual services rendered. The court, however, held that the government need not show that the payments were not reasonable pay for actual work.

The gravamen of Medicare Fraud is inducement. Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient. *Id.* at 29.

## V.  ADMINISTRATIVE INTERPRETATION

On May 7, 1992, the Office of the Inspector General of the Department of Health and Human Services issued a one page bulletin titled "Hospital Incentives to Physicians." The following are among ten questionable practices listed under "Suspect Hospital Incentive Arrangements— What to Look For:

The use of free or significantly discounted office space or equipment (in facilities usually located close to the hospital.)

Guarantees which provide that, if the physician's income fails to reach a predetermined level, the hospital will supplement the remainder up to a certain amount.

Low-interest or interest-free loans, or loans which may be "forgiven" if a physician refers patients (or some number of patients) to the hospital.

The reasoning underlying the anti-kickback statute is articulated in the bulletin:

As many hospitals have become more aggressive in their attempts to recruit and retain physicians and increase patient referrals, physician incentives (sometimes referred to as "practice enhancements") are becoming increasingly common. Some physicians actively solicit such incentives. These incentives may result in reductions in the physician's professional expenses or an increase in his or her revenues. In exchange, the physician is aware that he or she is often expected to refer the majority, if not all, of his or her patients to the hospital providing the incentives.

*         *         *         *         *

These incentive programs can interfere with the physician's judgment of what is the most appropriate care for a patient. They can inflate costs to the Medicare program by causing physicians to over use inappropriately the services of a particular hospital. The incentives may result in the delivery of inappropriate care to Medicare beneficiaries and Medicaid recipients by inducing the physician to refer patients to the hospital providing financial incentives rather than to another hospital (or non-acute care facility) offering the best or most appropriate care for that patient.

## V.  ANALYSIS

Although this is a case of first impression in that it involves physician recruitment by a hospital and the physician's referral of surgical patients to that hospital rather than a kickback, the Court is persuaded that the Agreement is well within the purview of 42 U.S.C. § 1395nn(b) (1983). *See Harvey L. Timkin, Medicare Fraud and Abuse,* 62 Wis.L.J. 13 (1989); (Incentive programs directly or indirectly aimed at inducing doctors to refer patients to a hospital violate the anti-kickback statute since the hospital provides a benefit to the doctor, therefore satisfying the remuneration requirement, in return for inducing referrals); *Francis J. Hearn, Curing the Health Care Industry: Government Response to Medicare Fraud and Abuse,* 5 J.Contemp.Health L. & Policy 175 (1989). ("If any form or remuneration is given to the recruited physician, then technically the recruitment program has violated the medicare anti-kickback provision.")

It is undisputed that the hospital agreed to and did provide remuneration to Defendant in the form of an interest free loan.

**1456**

It is also undisputed that the hospital agreed to provide free office space, rent and utility subsidies, and reimbursement for malpractice insurance. It is clear that these remunerations were subject to Defendant's referral of patients to the hospital absent exceptional circumstances. Furthermore, no effort beyond the Tom Gilbert letter was made to collect the money due under the Agreement until years after the due date, when Defendant had become embroiled in other litigation with the hospital. Finally, the Court takes judicial notice of its own records in *Peters v. Lake Livingston, et al.*, cause no. L–88–179–CA. P.Ex. 181, D.Ex. 81: The hospital's original stated reason for termination of Defendant's medical staff privileges was his failure to utilize it as his "primary hospital."

While the hospital may well have been motivated to a greater or lesser degree by a legitimate desire to make better medical services available in the community, there can be no doubt that the benefits extended to Defendant were, in part, an inducement for him to refer patients to the hospital. The Court must, therefore, find that the Agreement made the basis of this action violates 42 U.S.C. § 1395nn(b).

In conclusion, it follows under the applicable Texas law that the Agreement, being illegal, is void and unenforcible. *See E.G. Segal v. McCall,* 108 Tex. 55, 184 S.W. 188 (1916); *David Gavin Co. v. Gibson,* 780 S.W.2d 833 (Tex.Civ.App. Houston 14 1989); *Savin Corp. v. Copy Distributing Co.,* 716 S.W.2d 690 (Tex.Civ.App—Corpus Christi, 1986). Indeed, the policy against aiding in the enforcement of an illegal contract is such that a party that has inserted an illegal provision for its own benefit may nevertheless defend against a suit for breach of contract on the basis of the illegality. *Elray, Inc. v. Cathodic Protection Service,* 507 S.W.2d 570, (Tex.Civ.App. 14 1974). Accordingly it is

ORDERED, ADJUDGED, and DE-CREED that Plaintiff take nothing by this suit.