# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-3680

_____

United States of America,                          *
                                                   *
        Appellee,                                *
                                                   *
    v.                                             *
                                                   *
Cheryl Peterson,                                   *
                                                   *
        Appellant.                               *

Appeal from the United States
District Court for the Eastern
District of Arkansas.

_____

No. 99-3681

_____

United States of America,                          *
                                                   *
        Appellee,                                *
                                                   *
    v.                                             *
                                                   *
Ruth Ferguson,                                     *
                                                   *
        Appellant.                               *

_____

No. 99-3682
_____

United States of America,                    *
                                             *
                Appellee,                    *
                                             *
        v.                                   *
                                             *
Michael Falkner,                             *
                                             *
                Appellant.                   *


_____

No. 99-3683
_____

United States of America,                    *
                                             *
                Appellee,                    *
                                             *
        v.                                   *
                                             *
Frank Martin,                                *
                                             *
                Appellant.                   *

_____

Submitted:  April 13, 2000

Filed:  July 31, 2000
_____

Before RICHARD S. ARNOLD, ROSS, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Each of the appellants was convicted of one count of conspiracy to commit an offense against the United States, *see* 18 U.S.C. § 371, at least four counts of filing, or causing to be filed, false Medicare claims, *see* 18 U.S.C. § 287, *see also* 18 U.S.C. § 2(a), and one count of mail fraud, *see* 18 U.S.C. § 1341. They now appeal. We affirm the judgment of the trial court.[1]

I.

The conduct leading to the indictment arose out of the defendants' employment with American X-Rays, Inc., which provided mobile X-ray services to nursing home patients in a number of states, including Arkansas. Michael Falkner founded, owned, and was president of American, Ruth Ferguson was a regional manager who became the director of operations of American, Cheryl Peterson was a regional manager of American, and Frank Martin was an X-ray technician who became a regional manager of American.

American billed Medicare for the X-ray services that it provided to Medicare beneficiaries, and Arkansas Blue Cross and Blue Shield (BC/BS) received and paid the claims on behalf of Medicare. Each time American's mobile X-ray van made a trip to a nursing home, Medicare was to pay a single transportation fee, regardless of the number of X-rays made during that particular trip. According to the testimony of BC/BS employee Sherri Wright, American and other health care services providers

_____

[1]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

were repeatedly instructed that every trip's transportation fee should be prorated among the patients receiving services.

The government argued to the jury that the defendants conspired to defraud Medicare by not prorating, and therefore overbilling, these transportation fees. At trial an employee of American's billing agent introduced a chart showing that between May, 1994, and January, 1996, American billed for 16,162 full transportation fees and only 152 prorated charges. The defendants do not dispute that they overbilled BC/BS, but they claim that the overbilling resulted from various innocent mistakes, simple oversights, and misunderstandings.

The defendants' method of overbilling was quite simple. Each time American X-rayed a patient, the X-ray technician prepared a "service requisition form" (an American internal record) that provided the patient's name, address, insurance information, and the services received. During the relevant period the form also included a space for the X-ray technician to specify the number, and the sequence, of patients seen per visit.

The government introduced evidence that the defendants instructed American's X-ray technicians always to put the number "1" for the number of patients seen. This made it appear that only one patient had been seen on any given trip when, in reality, more than one patient had been seen. The technicians then faxed the requisition forms to American's home office. The information on the forms was used by billing clerk Vicki Lueck and later by American's billing agents to prepare the standard Medicare claim forms sent to BC/BS for payment.

The government also introduced evidence that the defendants sought to manipulate the sequence numbers in order to hide their fraud from BC/BS. According to American's pamphlet "How to Properly Complete ... [a] Service Requisition," the sequence numbers started at "001" at the beginning of each month and were to be used

in the order in which patients were seen to ensure that the requisition forms were not lost in transit to the billing office. The government introduced evidence that the defendants skipped, or instructed the X-ray technicians to skip, some sequence numbers, however, so that American could conceal the order in which the forms had been completed. This made it easier for American to file a number of non-prorated claims without making it obvious to BC/BS that all of the patients supposedly seen on individual visits were actually seen by the same X-ray technician on the same trip to one facility.

## II.

The defendants argue that the evidence was insufficient to sustain their convictions. In the present context, we are obliged to view the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences; we will reverse only if the jury must have had a reasonable doubt concerning one of the essential elements of the crime. *See*, *e.g. United States v. James*, 172 F.3d 588, 591 (8th Cir. 1999). The standard that we employ in reviewing a verdict is a strict one, for " 'a jury verdict should not be overturned lightly,' " *United States v. Washington*, 197 F.3d 1214, 1217 (8th Cir. 1999), quoting *United States v. Sykes*, 977 F.2d 1242, 1247 (8th Cir. 1992). Before rehearsing the specific evidence against each defendant, and considering its force, however, we review briefly the statutes that all of the defendants were charged with violating.

The conspiracy count, *see* 18 U.S.C. § 371, requires the government to prove that two or more defendants performed some "act to effect the object of the conspiracy." Proof of a formal agreement is not necessary. *See United States v. Anderson*, 879 F.2d 369, 376 (8th Cir. 1989), *cert. denied,* 493 U.S. 982 (1989). Evidence of a common plan or a tacit understanding, which may be shown by circumstantial evidence with respect to the conduct of the conspirators and any attendant circumstances, is sufficient. *See United States v. Kelly*, 989 F.2d 980, 982 (8th Cir. 1993), *cert. denied*, 510 U.S. 874 (1993). We have noted that " '[s]eemingly

innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.' " *Id.*, quoting *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984).

The defendants were also convicted of "mak[ing] or present[ing]" a claim against the United States, "knowing such claim to be false, fictitious, or fraudulent," *see* 18 U.S.C. § 287, regardless of whether the defendant was a principal or merely aided or abetted someone else in the submission of a false claim, *see* 18 U.S.C. § 2(a). *See generally United States v. Burns*, 162 F.3d 840, 850 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1477 (1999).

Each of the defendants was also convicted of using the mails for the "purpose of executing" a scheme to defraud, *see* 18 U.S.C. § 1341. The government need not prove that a defendant personally mailed a document but only that a defendant committed "an act with knowledge that the use of the mails [would] follow in the ordinary course of business, or where such use [could] reasonably be foreseen, even though not actually intended," *Pereira v. United States*, 347 U.S. 1, 8-9 (1954).

## A.  Mr. Falkner

Mr. Falkner argues that the government failed to prove his involvement in a conspiracy to file false claims, failed to establish that he caused X-ray technicians Alan Bangs and Stanley York to file seven false Medicare claims between August, 1995, and May, 1996, and failed to prove that he was guilty of mail fraud. We disagree.

Mr. Falkner purchased American's Arkansas predecessor from Paul Kuna in 1992. Mr. Kuna testified that during a 1992 meeting Mr. Falkner claimed that they could get around the transportation rule by walking out of the nursing home and then walking back in. Mr. Kuna stated that he told Mr. Falkner that this was illegal but that Mr. Falkner did not respond.

Mr. Falkner revealed in a 1992 letter to BC/BS that he "underst[oo]d" that "when two or more patients [were] examined at the same facility ... on the same trip, then the transportation fee [was] to be divided by the number of patients examined on that trip." But witnesses testified that Mr. Falkner nevertheless instructed at least two X-ray technicians to put "1" for the number of patients seen, regardless of how many patients were actually seen during a particular visit. Mr. Bangs testified that he questioned the propriety of this practice but that Mr. Falkner told him to do "as [he had] been instructed to do." Mr. York also testified that Mr. Falkner told him always to put "1" for the number of patients seen. In light of this and other evidence against Mr. Falkner, and in view of the deference that we must show to the jury's finding of fact, *see United States v. Kendall*, 138 F.3d 1235, 1238 (8th Cir. 1998), we cannot say that Mr. Falkner was entitled to a judgment of acquittal.

## B. Ms. Ferguson

Ms. Ferguson, one of American's original employees, was a regional manager in 1992 and became the director of operations in 1994. She was charged with causing X-ray technician Gerald Womack to submit seven fraudulent Medicare claims between October, 1993, and February, 1994. Ms. Ferguson testified that she knew how to fill out the forms properly; indeed, she stated that, as a regional manager, it was her responsibility to train the X-ray technicians on how to complete the forms.

According to Mr. Womack, however, Ms. Ferguson nevertheless filled out three forms in 1993 by putting "1" for the number of patients seen, even though all of the services were performed during the same trip to one facility. Mr. Womack also testified that Ms. Ferguson would "get onto [the X-ray technicians]" if they did not skip some sequence numbers and that on three forms dated January, 1994, Ms. Ferguson had instructed him to put "1" for the number of patients seen and to skip some sequence numbers. X-ray technician Velvette Womack also testified that Ms. Ferguson instructed her always to put "1" for the number of patients seen and to skip some

sequence numbers "so that it looked like ... I was seeing one patient at one facility then seeing another patient at another facility."

Gerald Womack testified in addition that at some point American employee Bob Bechard told him that it was no longer necessary to skip some sequence numbers. According to Mr. Womack, Ms. Ferguson told him that Mr. Bechard was wrong, that they needed to start skipping some sequence numbers again, and that if he refused to put "1" for the number of patients seen or to skip some sequence numbers, he would be fired. Mr. York, who left American in 1994, testified that Ms. Ferguson had accompanied him on trips and would correct him if he was "doing something wrong procedurally." According to Mr. York, she never corrected him when he incorrectly put "1" for the number of patients seen. Ms. Ferguson told X-ray technician David Prince in 1993, moreover, always to put "1" for the number of patients seen so that he would "get [his] bonus."

William Hagan managed American after Vencor, Inc., acquired it in 1996. Mr. Hagan testified that, when he questioned Ms. Ferguson about the billing and transportation charges, she admitted that the X-ray technicians were always told to put "1" for the number of patients seen. He testified that she also admitted to knowing that this failure to prorate was "wrong" and "not ... consistent with Medicare regulations" and that she knew that the X-ray technicians had been instructed to skip some sequence numbers "in order to give the appearance that multiple trips had taken place when in fact only one trip had taken place." We believe that this and other evidence is sufficient to support the verdict against Ms. Ferguson.

## C. Ms. Peterson

The charges against Ms. Peterson are based on seven instances of causing Mr. Bangs to file false claims. Ms. Peterson concedes that the government's evidence establishes that she had knowledge of the overbilling, but she contends that the government did not provide sufficient direct or circumstantial evidence of her criminal

intent when the first illegal act occurred in August, 1995. *See generally Morissette v. United States*, 342 U.S. 246, 251 (1952), stating that criminal liability generally requires the "concurrence of an evil-meaning mind with an evil-doing hand." We do not agree with Ms. Peterson's contention.

Ms. Ferguson testified that she taught Ms. Peterson how to fill out the relevant forms properly, and X-ray technician Patricia Welch testified that Ms. Peterson knew how to complete the forms properly by September, 1993. Ms. Peterson, like Mr. Falkner and Ms. Ferguson, nevertheless repeatedly instructed X-ray technicians that they were to put "1" for the number of patients seen, regardless of how many patients actually were seen. Mr. Bangs, for example, testified that, in addition to instructing him always to put "1" for the number of patients seen, Ms. Peterson also told him to skip some sequence numbers on the claim forms because that way it "looked like we made more than one trip to [a] particular nursing home."

Ms. Peterson maintains that the record does not reveal precisely when the discussion with Mr. Bangs took place. Our review of the trial transcript, however, reveals that the government questioned Mr. Bangs about two forms that were completed in July, 1995. The government attorney asked, "Prior to filling these [claim forms] out, had you ever had any discussion with anyone about skipping sequence numbers," to which Mr. Bangs responded in the affirmative and described his discussion with Ms. Peterson. X-ray technician Bill McNeil testified that, in approximately June or July, 1995, Ms. Peterson instructed him to put "1" for the number of patients seen because, "without the trip charges, [they] would not make any money." Contrary to Ms. Peterson's assertion, then, there is a good deal of evidence that she made incriminating statements before the occurrences that gave rise to the first false claims count. We believe, therefore, that the government presented sufficient evidence to support Ms. Peterson's convictions.

## D. Mr. Martin

Mr. Martin also argues that the government's proof was insufficient to support his convictions. The false claims counts against Mr. Martin are based on service requisition forms that he submitted in December, 1993, and February, 1994. Mr. Martin concedes in his brief that there is evidence indicating that he attended a 1992 meeting with Mr. Kuna, Mr. Falkner, and Mr. York in which Mr. Falkner claimed that a second trip could be billed as long as American's X-ray technicians left the building temporarily. Ms. Ferguson also testified that she instructed Mr. Martin on how to complete the forms properly and that Mr. Martin received a manual containing written instructions on the same topic. The evidence shows that Mr. Martin nevertheless subsequently filled out forms improperly. For example, he prepared and submitted to American 25 requisition forms that were all dated a single day in January, 1994, thus suggesting that he had driven 2,100 miles and X-rayed 25 patients on that one day.

Gerald Womack testified that Mr. Martin agreed that it was a "hassle" to skip sequence numbers and that Mr. Martin stated that he had "gotten a promotion over [Mr. Womack] for the regional manager [position] because he had lied ... to Medicare [about the transportation fee]." Velvette Womack testified similarly that Mr. Martin had admitted to her that he lied to Medicare regarding billing for multiple trips. Although Mr. Martin repeatedly points out that he testified and denied the allegations, it is the jury's province to resolve conflicts in the testimony. *See United States v. Rosso*, 179 F.3d 1102, 1107 (8th Cir. 1999). We believe that the evidence against Mr. Martin was sufficient to support his convictions.

## III.

Mr. Falkner, Ms. Ferguson, and Mr. Martin contend that there was no statute or regulation in existence that made it illegal to fail to prorate transportation charges and that their conduct therefore did not constitute a criminal offense. We disagree.

The government showed that these defendants engaged in a scheme of intentional overbilling, thereby violating 18 U.S.C. § 287 by defrauding Medicare. The defendants' conspiracy to defraud the United States by filing these false claims violated 18 U.S.C. § 371. The scheme to defraud the United States was accomplished in addition by using the mails, which violated 18 U.S.C. § 1341. We believe that these statutes quite clearly render illegal the fraudulent conduct that was proved.

The defendants argue that *United States v. Porter*, 591 F.2d 1048 (5th Cir. 1979), is apposite authority. The defendants in *Porter*, 591 F.2d at 1050, were two physicians and a laboratory operator. The physicians routinely sent patients' blood samples to an independent laboratory for analysis, and the laboratory in turn paid the physicians a "handling" fee, *id.* at 1051. The government characterized these fees, however, as illegal bribes or kickbacks. *Id.* The *Porter* court rejected the government's position, holding that there was "no falsification of government reports or records," *id.* at 1054, no breach of trust, no loss of property or money on the part of the government, *id.* at 1055-56 n.6, and no "duty imposed upon any of [the] defendants by a statute or regulation, the violation of which would amount to a misapplication of federal funds," *id.* at 1054. The court concluded, in other words, that the giving and receiving of the "handling" fees did not violate the law in any way. *Id.* at 1058.

Unlike the defendants in *Porter*, the defendants here intentionally caused false and misleading information to be included on the requisition forms. This, in turn, caused false statements to be included on the billing forms that American sent to BC/BS, with the result that BC/BS paid American for services that were never performed. We therefore conclude that *Porter* is entirely inapposite.

## IV.

Ms. Ferguson contends that the government violated her due process rights by presenting the perjured testimony of Mr. Womack, who testified that, with the exception of his name, the information contained in three separate requisition forms that

he signed was provided and written in by Ms. Ferguson.  Mr. Prince, however, testified that he was present when the forms were filled out, that he had filled out a portion of the forms, and that he did not recognize Ms. Ferguson's handwriting on any of the forms.

To prove that the government violated Ms. Ferguson's right to due process by using false testimony, Ms. Ferguson must show that the government used perjured testimony, that the government knew or should have known of the perjury, and that a reasonable likelihood exists that the perjured testimony could have affected the jury's judgment.  *See United States v. Papajohn*, 212 F.3d 1112, 1117 (8th Cir. 2000).  The mere presence of a conflict between the testimony of Mr. Womack and Mr. Prince is insufficient to establish perjury, however, *see generally United States v. Jordan*, 150 F.3d 895, 900 (8th Cir. 1998), *cert. denied*, 526 U.S. 1010 (1999), and our careful examination of the record reveals no other reason to conclude that Mr. Womack perjured himself.  We therefore reject Ms. Ferguson's contention in that regard.

V.

Mr. Martin appeals the trial court's refusal at sentencing to depart downward on the basis of his asserted exceptional family responsibilities.  The trial court's decision to deny a downward departure is reviewable only if Mr. Martin can show that the trial court had an unconstitutional motive in denying his request or if the trial court erroneously believed that it lacked the authority to depart, *see generally United States v. Johnson*, 169 F.3d 569, 573 (8th Cir. 1999).  Mr. Martin makes neither showing but, rather, argues that the trial court's comment that he would "certainly have every opportunity to appeal this denial before ... report[ing] to prison" somehow authorizes our review.  Although the trial court was mistaken when it implied that Mr. Martin could appeal the denial of a downward departure, *see United States v. Field*, 110 F.3d 587, 591-92 (8th Cir. 1997), that mistake does not make the trial court's decision reviewable, *see Johnson*, 169 F.3d at 573.  We therefore reject Mr. Martin's argument on that issue.

## VI.

Having reviewed the defendants' remaining arguments, we have concluded that they are without merit.  We therefore affirm the judgment of the trial court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.